UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

WILLIE JACKSON,

                Petitioner,          **MEMORANDUM & ORDER**
                                              15-CV-1403(EK)(LB)

        -against-

ADA PEREZ, Superintendent,

                Respondent.

------------------------------------x

ERIC KOMITEE, United States District Judge:

## Table of Contents

I. Introduction ............................................. 2

II. Factual Background ....................................... 3

III. Procedural History ...................................... 6

  A. Pre-Trial Suppression Hearing ........................... 6

  B. Suppression Hearing Reopened ........................... 12

  C. Pre-Trial Hearings ..................................... 15

  D. Trial .................................................. 16

    1. The State's Case ..................................... 16

    2. The Defense Renews Its Request to Suppress Evidence ... 20

    3. Petitioner's Testimony ............................... 21

    4. Conviction and Sentencing ............................ 23

  E. Direct Appeal and Post-Conviction Relief ............... 23

IV. Standard of Review ...................................... 26

V. Discussion .............................................. 27

  A. Ground One: Denial of Right to Self-Representation ..... 27

  B. Ground Two: Prosecutorial Misconduct ................... 33

    1. Applicable Law ....................................... 35

      a. *Brady v. Maryland* ................................ 35

      b. Use of False Testimony ............................. 35

1

2. Failure to Turn Over Witness Statements Regarding the Alleged Identification  Procedure ........................ 36

3. Failure to Identify the 60th Precinct Officers and Turn Over the "Log Sheet" ...................................... 39

4. Failure to Correct the Testimony of the 61st Precinct Officers .................................................. 40

5. Failure to Produce the 911 Call Record and to Correct the Testimony of Sarine Gabay ............................... 42

6. Alteration of the Videotaped Confession .............. 42

C. Ground Three: Ineffective Assistance of Counsel ....... 44

D. Ground Four: Failure to Reopen the Suppression Hearing ................................................. 48

VI. Evidentiary Hearing .................................... 52

VII. Conclusion .......................................... 53

## I.   Introduction

Willie Jackson, proceeding *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On March 9, 2010, following a bench trial, Petitioner was found guilty of burglary in the third degree, criminal mischief in the fourth degree, petit larceny, and criminal possession of stolen property in the fifth degree.  He was sentenced to a term of imprisonment of fifteen years to life, and is currently incarcerated.

The petition asserts four grounds for habeas relief: (1) the state court denied Petitioner's request to represent himself at a hearing on his motion to suppress certain evidence, in violation of the Sixth Amendment; (2) the prosecution committed misconduct by, among other things, failing to turn

over exculpatory evidence pursuant to *Brady* and failing to correct false testimony at the suppression hearing and trial; (3) his counsel rendered constitutionally ineffective assistance; and (4) the trial court violated his due process rights by refusing to reopen the suppression hearing following certain trial testimony.  Petitioner also requests an evidentiary hearing.

For the reasons set forth below, the request for an evidentiary hearing is denied, and the petition is denied in its entirety on the merits.

## II.  Factual Background

Police officers arrested Petitioner on October 4, 2007 at approximately 1:20 a.m. for breaking a window at the Carvel store at 2733 Coney Island Avenue in Brooklyn, New York, and stealing the cash register.  The following facts, taken from the state court trial record (unless otherwise noted), are summarized "in the light most favorable to the verdict." *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

Officers Adam Rothman and Jon-Kristian Rzonca — both from the 61st Precinct of the New York City Police Department — were on patrol when they received a radio transmission reporting a burglary in progress at the corner of Avenue Y and Coney

Island Avenue.  Trial Tr.[1] 23:9-21 (Rothman); 163:3-14 (Rzonca).

After the officers responded, they saw Petitioner walking down

Avenue Y; as they approached, they witnessed him put a large box

on the ground and walk away from it.  *Id.* 27:6-17 (Rothman);

167:11-20 (Rzonca).  Moments later, they saw that the box was a

cash register.  *Id.* 28:11-24 (Rothman); 169:23-170:7 (Rzonca).

As discussed below, officers from both the 60th and 61st

Precincts responded, and recollections about which set of

officers reached Petitioner first varied somewhat between the

suppression hearing testimony and the trial testimony.  Shortly

after the stop, though, Officer Rothman searched the Petitioner

and recovered a set of keys from his pocket, which were later

determined to fit the cash register.  H1 Tr. 14:6-13; 16:12-19

(Rothman).  The 60th Precinct officers then took Petitioner to

their station.  Trial Tr. 63:8-9 (Rothman).  After visiting the

Carvel store, Officers Rothman and Rzonca picked up Petitioner

from the 60th Precinct station and brought him to the 61st.  *Id.*

63:14-64:7 (Rothman).  There, he confessed to stealing the cash

---

[1]  "Trial Tr." is the trial transcript from March 2, 2010 to March 9, 2010.  "H1 Tr." is the suppression hearing transcript from January 20, 2009 and January 21, 2009.  "H2 Tr." is the transcript from the February 17, 2009 hearing in which Justice Konviser read her opinion on the suppression motion into the record.  "H3 Tr." is the transcript from the reopened suppression hearing on June 11, 2009.  "H4 Tr." is the July 29, 2009 hearing transcript in which Justice Konviser read her opinion into the record regarding the reopened suppression hearing.  "H5 Tr." and "H6 Tr." are pretrial conference transcripts from July 30, 2009 and October 2, 2009, respectively. "Sentencing Tr." is the sentencing transcript from April 23, 2010.

register in a statement to Detective Marcia Baughan, which she
recorded in writing, and also in an oral statement given on
video to Assistant District Attorney ("ADA") John Giannotti,
during which Officer Rothman was also present.  *Id.* 72:20-21
(Rothman).

> Petitioner maintains that the events in question
transpired very differently.  According to him, this is a case
of mistaken identity; he claims that he never broke into the
store, never had a cash register, and never even saw Officers
Rothman or Rzonca until they appeared at his pretrial
suppression hearing, despite their extensive testimony about
responding to the radio call, searching Petitioner, recovering
the cash register, arresting him, transporting him after the
arrest, and sitting through his confession.  Petitioner
acknowledges he was arrested near the Carvel on the night in
question, but claims the arresting officers were only from the
60th Precinct, and they obtained important proof of his innocence
when they conducted a "showup identification procedure" "at the
crime scene."  Petition at 3.[2]  He claims that during this
identification procedure, a series of bystanders — purportedly
eyewitnesses to the crime — confirmed he "was not the
perpetrator."  Petitioner's Br. at 4, ECF No. 1-2; *see also*

---

[2] Citations to a given page of the Petition refer to the pagination
assigned by ECF, rather than the document's internal pagination.

Petitioner's Reply Br. at 11, ECF No. 10.  These exculpatory

statements, Petitioner contends, are lost to posterity because

of the State's inability to identify the witnesses in question

or the officers from the 60th Precinct who purportedly conducted

the identification procedure.  In support of these claims, the

Petitioner has proffered only his own testimony.  *See* Trial Tr.

236-87.

### III. Procedural History

### A.    Pre-Trial Suppression Hearing

        Prior to trial, Petitioner moved to suppress

(1) certain physical evidence — the cash register and its keys —

seized around the time of his arrest, on the ground that there

was no probable cause for the search or seizure; and (2) his

written and videotaped confessions, on the ground that they were

involuntarily made.  In response to these requests, the state

court conducted a two-day *Dunaway* / *Mapp* / *Huntley* hearing[3] on

January 20 and 21, 2009 before Justice Jill Konviser.  *See*

H1 Tr.  Three witnesses testified:  Officers Rothman and Rzonca,

and Detective Marcia Baughan from the 61st Precinct.

---

        [3]  A hearing pursuant to *Dunaway v. New York*, 442 U.S. 200 (1979)
addresses whether a defendant's statement subsequent to arrest must be
suppressed due to lack of probable cause for the arrest.  A hearing pursuant
to *People v. Huntley*, 15 N.Y.2d 72 (1965) is used to determine the
voluntariness of a defendant's statement.  And a *Mapp* hearing addresses
whether physical evidence should be suppressed.  *Mapp v. Ohio*, 367 U.S. 643
(1961).

On the first day of the hearing (January 20, 2009), Officer Rothman testified that around 1:20 a.m. on October 4, 2007, he and his partner Officer Rzonca were on patrol when they received a radio alert of a burglary in progress on Coney Island Avenue at Avenue Y. *Id.* 10:9-11:5. Rothman testified that the radio alert described a "black male, carrying a box heading westbound towards Ocean Parkway on Avenue Y." *Id.* 11:1-5.

They drove east on Avenue Y and saw a man, later identified as Petitioner, about a block away carrying a large box. *Id.* 11:22-12:10. The officers then saw him put the box down on the street and continue walking. *Id.* 13:1-3. They pulled up and stopped Petitioner, who was then a block away from the Carvel. *Id.* 19:11-14. The officers then "walked him" to "another patrol car [that] had pulled up." *Id.* 14:2-4. Once at that patrol car, Rothman handcuffed Petitioner and frisked him and, feeling a hard object in his pocket, removed that object, which turned out to be a set of keys. *Id.* 14:6-13; 16:12-19. Rothman and Rzonca then "put him in the other officers' car who were there to secure him." *Id.* 20:20-23. After Petitioner was "secure," Rothman saw that the box Petitioner discarded was a cash register. *Id.* 16:24-7:3; 19:22-25.

Rothman and Rzonca then proceeded to the Carvel, *id.* 20:20-21:21, while the 60th Precinct officers took Petitioner to "the stationhouse," *id.* 38:4-9. Officers Rothman and Rzonca

7

interviewed the Carvel owner Patrick Aceto, who had just arrived at the scene, and confirmed that the store's cash register had been stolen and the seized keys fit the register's drawer lock. *Id.* 21:17-22:6; 23:15-20.  Rothman testified on cross-examination that he never conducted an identification procedure, nor did he know of any other officer who did.  *Id.* 43:10-17.

The court next heard testimony from Detective Marcia Baughan, who had taken and transcribed Petitioner's first confession at the 61st Precinct stationhouse.  She testified that, before taking his statement, she read Petitioner his *Miranda* rights from a form, which he signed and initialed next to every right.  *Id.* 50:3-15; 54:23-25.  The prosecution introduced Petitioner's transcribed statement into evidence through Detective Baughan.  It read as follows:

> I was on the boardwalk in Coney Island on Wednesday night.
> I went for a walk.  I saw a Carvel and there were kids
> inside working.  Then I thought, do I want to stay out or
> go back to jail?  I don't want to hurt anyone to go back.
> I wait until the store closed.  The employees left.  I made
> sure that they were gone and went to the side window where
> the picnic tables were and I kicked the window.  I went
> inside and took the cash register.  I climbed back out the
> same window with the cash register and walked westbound on
> Avenue Y, then the police came and stopped me, then I was
> arrested.

*Id.* 59:2-12.  Detective Baughan, too, denied having knowledge of any officer conducting an identification procedure and stated

there was no information in Petitioner's case file concerning such a procedure. *Id.* 63:24-64:13.

At the end of the first day of suppression-hearing testimony, defense counsel Ivan Vogel announced that Petitioner wanted him "relieved" as counsel. *Id.* 83:1-2. This revelation came immediately after Justice Konviser decided *sua sponte* to call Officer Rzonca to testify the following day. *Id.* 83:13-16 ("This hearing is going to continue tomorrow. I am going to ask you to have the partner of Officer Rothman available first thing in the morning."). Justice Konviser's initial response to the request that counsel be relieved was "No." *Id.* 83:3. Petitioner then stated, "I am going *pro se,* your Honor." *Id.* 83:4-5. Justice Konviser answered, "You are not going *pro se* unless I say you are going *pro se.* Who's the Judge in this courtroom?" *Id.* 83:6-8. She continued:

> I do see from your file you had another very good lawyer who also asked to get relieved early on from Legal Aid Society. You have another very good lawyer standing next to you. And you have a right to have a lawyer, a good one, and you have that. You don't have the right to the lawyer of your choice, unless you want to hire someone, sir. That's the rules.

*Id.* 83:18-24. Petitioner explained that he was dissatisfied with Mr. Vogel's failure to object to Officer Rothman's testimony that the radio alert described the suspect as a "black male," when the transmission had not, in fact, mentioned race. *Id.* 84:1-3. The day's proceeding then adjourned.

9

On the following day (January 21), Mr. Vogel continued to represent Petitioner at the suppression hearing without any mention of the representation issue.  Rzonca's testimony at this hearing was substantially similar to Officer Rothman's the day before.  He testified to the same sequence of events regarding the stop and arrest, stating that the 60th Precinct officers arrived on the scene "simultaneously."  *Id.* 102:9-14; 106:3-4. Rzonca's testimony also clarified certain points.  He stated that it was about three to four minutes after arresting Petitioner that the officers received confirmation that the burglary involved a stolen cash register from the nearby Carvel. *Id.* 107:6-108:15.  He also testified that the 60th Precinct officers initially took Petitioner back to their stationhouse, and that after visiting the crime scene, he and Rothman picked the Petitioner up there and transported him to the 61st Precinct. *Id.* 115:24-25.

The representation issue came up again near the end of the hearing.  Following Rzonca's testimony, Justice Konviser asked the parties to "step up on scheduling" and held a sidebar off the record.  *Id.* 134:19-21.  Following that discussion, Justice Konviser stated:

> [L]et me just put this all on the record . . . . Yesterday, when you left here, you indicated that perhaps you wanted to go *pro se* or handle this case without the assistance of Mr. Vogel, and now your attorney tells me you want to think about it, you are not so sure . . . so the

10

> record is clear, I did see you conferring with Mr. Vogel
> today as he was going through the process here today, in
> terms of the hearing.

*Id.* 135:3-16.

Justice Konviser then informed Petitioner of his right to self-representation.  She advised him that "before you decide whether or not you're going to ask me that you want to go *pro se* . . . you need to understand" the level of training required of lawyers to try cases effectively.  *Id.* 135:17-136:5.  Justice Konviser concluded, "You can think about it, let me know.  If you do, I will go over everything with you and you let me know what you want to do."  *Id.* 136:3-5.  The suppression hearing then concluded.

Several weeks later, on February 17, 2009, Justice Konviser denied the motion to suppress.  She found that (1) the officers had reasonable suspicion to stop Petitioner, H2 Tr. 10:14-15; (2) they had probable cause for his arrest (once the officers saw the cash register and, minutes later, learned that a cash register had been stolen from the Carvel), *id.* 12:2-18; (3) the cash register was lawfully seized because Petitioner "abandoned" it by "dropp[ing] it to the ground" and "walk[ing] away from it," *id.* 15:9-13; (4) Petitioner's transcribed and video-recorded confessions were made "freely and voluntarily," *id.* 16:1-3; and (5) he validly waived his *Miranda* rights in advance of those confessions, *id.* 16:6-25.  The court did,

11

however, grant Petitioner's motion to suppress the keys to the cash register, because Officer Rothman acknowledged he did not believe they were a weapon when he removed them from Petitioner's pocket during the initial frisk.  *Id.* 14:18-15:8.

After this ruling, Petitioner expressed dissatisfaction with his lawyer yet again.  Following a sidebar, H2 Tr. 20:17-18, Justice Konviser confirmed, without mentioning Petitioner's prior *pro se* requests, that he was now seeking the appointment of a new lawyer rather than to proceed *pro se*.  She stated:  "As I understand, Mr. Jackson, the last time you were here you were unhappy with your lawyer.  Obviously, you have now won part of your [suppression] motion that he made on your behalf, but is this what you want to do, sir?"  *Id*. 20:19-23.  Petitioner replied, "Yes."  *Id*. 20:24.  Justice Konviser concluded, "Okay.  This is the last chance you are going to get . . . The next lawyer is the lawyer you are going to get.  This is the last time I am going to have this discussion."  *Id*. 20:25-21:4.  The court then assigned Petitioner his third lawyer, Kleon Andreadis.  *Id*. 21:5-7.

**B.   Suppression Hearing Reopened**

Petitioner's counsel asked the court to reopen the suppression hearing to allow Mr. Jackson to testify on his own behalf.  H3 Tr. 1:10-13.  On April 13, 2009, Justice Konviser

granted this request, and Petitioner testified on June 11, 2009.
*Id.*

Petitioner testified as follows.  At around 1:30 a.m.
on October 4, 2007, he had walked from a 7-11 store to the
picnic benches behind the Carvel, where he was planning to sleep
because he had lost his bed at a homeless shelter.  *Id.* 4:3-22.
While walking to the picnic benches, he observed a woman walking
her dog and five teenaged employees outside the Carvel.  *Id.*
5:10-6:15.  He then heard a siren go off from inside the store.
*Id.* 6:18-22.  A few minutes later, an unmarked police car pulled
up and a detective asked Petitioner what he was doing there.
*Id.* 7:6-12; 46:17-18.  When Petitioner replied he was looking
for a place to sleep, the detective handcuffed him and placed
him in the police car.  *Id.*  The detective then drove the car to
the front of the Carvel, where the alleged identification
procedure took place:

> [H]e [the unidentified officer] asked the female could she
> recognize me or identify me . . . She told him, no.  Also,
> the three teens, he asked them the same thing, and they
> said no.  After that, about ten minutes, ten, 15 minutes
> later, the other two teens came back to the store . . . But
> I think it was the owner, the same van that picked them up
> . . . [c]ame back . . . .   So the detective asked all
> three of them could they identify me, and they said, no.

*Id.* 7:14-8:11.

Officers then took Petitioner to a police station,
which he believed was the 61st Precinct.  *Id.* 9:2-9.  Petitioner

did not provide any other information about these officers or indicate whether they worked for the 60th or 61st Precinct. Petitioner did, however, testify that Rothman and Rzonca were not the arresting officers and, despite their extended testimony about the night in question, Petitioner said he had never seen them before the suppression hearing. *Id.* 19:6-9.

> At the station, Petitioner testified, he asked to speak with his attorney before making his first inculpatory statement. *Id.* 10:9-13; 58:19-59:5. But he acknowledged he did not ask for a lawyer during the subsequent videotaped confession he made there, or any time thereafter. *Id.* 49:15-50:4. Petitioner also testified that he only made these statements because Detective Baughan promised him placement in a "program" in exchange for his confession. *Id.* 11:25-12:12.

> Several weeks later, the court affirmed its prior rulings on suppression, H4 Tr. 3:6-15, finding Petitioner's testimony "incredible and unworthy of belief," *id.* 7:23-25. Justice Konviser went on to reiterate that she found the testimony of Officers Rothman and Rzonca to be "detailed" and "credible," and that Petitioner had offered no "credible reasons why these two officers . . . offered perjurous testimony." *Id.* 8:3-11.

> After Justice Konviser read this order into the record, Petitioner renewed his request to proceed *pro* se. Mr.

Andreadis informed the court that Petitioner "is going to proceed *pro se* in this case" and no longer wanted representation.  H4 Tr. 10:12-20.  Justice Konviser asked Petitioner, "Is that what you want to do, Mr. Jackson?"  *Id.* 11:1-2.  He replied, "Yes, ma'am."  *Id.* 11:3.  Justice Konviser then informed Petitioner once again of the risks associated with self-representation.  During this conversation, Petitioner stated that he only wanted a Black attorney, and would represent himself if one were not assigned.  *Id.* 36:11-12.  Also during this exchange, Mr. Andreadis complained that Petitioner wanted him to "chase down a prim rose path of suspicion" relating to Petitioner's contention that the videotaped confession had been tampered with.  *Id.* 34:1-7.  The hearing was then adjourned.

## C.    Pre-Trial Hearings

        The next day, July 30, 2009, Justice Konviser explained that she adjourned to give Petitioner "a chance to really think about . . . the dangers and disadvantages of self-representation."  H5 Tr. 2:10-16.  She advised, "I'm going to tell you that if you really want to represent yourself, I'm going to let you do that.  That's your right."  *Id.* 2:17-19.  Justice Konviser then explained that Petitioner had two options: he could either proceed as his own attorney or she would assign new counsel.  *Id.* 54:25-55:4.  Petitioner stated, "Yes, I'll

take another one." *Id.* 5:5.  Justice Konviser relieved

Andreadis.  *Id.* 5:6-7.

> At the next pre-trial hearing, on October 2, 2009,
Petitioner's fourth lawyer, Martin Goldberg, informed Justice
Konviser that Petitioner wanted to proceed *pro se* at trial.
H6 Tr. 2:21-22.  After once again confirming Petitioner
understood the disadvantages of proceeding *pro se*, the judge
granted Petitioner's request to represent himself, with Goldberg
to be present at trial as an "advisor."  *Id.* 15:2-17.

**D.   Trial**

> Petitioner opted for a bench trial.  The trial
commenced in front of Justice Danny Chun on March 2, 2010.
Petitioner began the trial representing himself — delivering the
defense's opening statement and cross-examining Officer Rothman
himself, among other things.  At the start of the second day,
however, Mr. Goldberg told Justice Chun that Petitioner again
wanted legal representation.  Trial Tr. 88:19-89:8.  Justice
Chun confirmed with Petitioner that he no longer wanted to
proceed *pro se*, and Mr. Goldberg resumed representation for the
remainder of trial.  *Id.*

### 1.   The State's Case

> The State presented the following evidence in its
case-in-chief.  Sarine Gabay testified that she lived near the
Carvel and was awoken in the early hours of October 4, 2007 by a

loud noise.  Trial Tr. 214:24-215:13.  She observed through her window that the Carvel was surrounded by shattered glass and saw a person leave the store carrying something.  *Id.* 216:1-217:10. Ms. Gabay called 911 to report the burglary and reported the direction in which the suspect was heading, which matched the path Petitioner traveled.  *Id.* 216:17-18, 217:21-218:5.

Officers Rzonca and Rothman testified to the circumstances of the stop and arrest, as they did at the suppression hearing, but their rendition of which officers stopped the Petitioner first diverged somewhat from their suppression-hearing testimony.  At trial, they testified that the unidentified officers from the 60th Precinct reached Petitioner simultaneously or first.  Rzonca testified that "there was a plainclothes unit from the 60 Precinct that came up behind [Petitioner], and we pretty much simultaneously pulled up on him," *id.* 168:3-5, but that the 60th Precinct officers might have arrived a "couple of seconds before us," *id.* 171:1-3; *see also* 180:9-11 (it was a "[m]atter of seconds").  Rothman testified that by the time he and Rzonca got out of the car, Petitioner "was already stopped, with his hands on the back of [an] unmarked police car" from the 60th Precinct.  *Id.* 36:22-25.[4]

---

[4] Compare Rothman's testimony at the suppression hearing, in which he stated that when he and Rzonca stopped Petitioner, "another patrol car had pulled up, so we walked him to that patrol car with our hands on him."  H1 Tr. 14:2-4.

Rzonca could not remember who told Petitioner to "stop" — it could have been either him, Rothman, or the 60th Precinct officers. *Id.* 186:23-25. Neither Rothman nor Rzonca knew the 60th Precinct officers' names. *Id.* 61:18-19, 62:12-15 (Rothman); 170:17-23 (Rzonca).

Petitioner, still proceeding *pro se* at this point, asked Rothman a number of questions about the alleged identification procedure. Rothman denied asking the Carvel owner to identify the perpetrator, *id.* 57:23-58:2; 59:16-22, denied making a report concerning the description of the perpetrator from speaking to anyone at the scene, *id.* 58:10-16, and denied putting Petitioner in a "lineup," *id.* 74:25-75:13. Pursuing his theory — advanced in opening argument — that the officers "covered" up the identification procedure "by saying that they took me to the 60 [sic] Precinct for half an hour," *id.* 19:5-10, Petitioner asked Rothman whether he had had to log Petitioner in or out of the 60th Precinct. Rothman replied simply, "No." *Id.* 64:11-14.

The owner of the Carvel, Patrick Aceto, also testified. He stated that around 1:30 in the morning of October 4, 2007, his alarm company alerted him of the break-in; he then went to the Carvel store, arriving between 1:45 and 2:00 a.m. *Id.* 102:20-103:12. On cross-examination, Aceto testified that he did not recall any officer asking him to "look at anybody at

18

that time," and that he was not asked to "look at pictures of anybody" or at a "lineup." *Id.* 113:10-13; 113:23-114:3.  Aceto went on to testify that he had never seen Petitioner before the day of his testimony. *Id.* 108:25-109:3; 116:5-6.

The State again called Detective Baughan, who transcribed Petitioner's oral statement, *id.* 128:17-130:10, and ADA Giannotti, who interviewed Petitioner during his videotaped confession, *id.* 201:15-25; 204:9-11.  The State introduced the videotaped confession and played it in its entirety.  *Id.* 206:2-207:10.  Although Petitioner had claimed, in his opening argument, that the videotape was "altered, tampered with," *id.* 19:20-22, ADA Giannotti testified that the videotape "accurately represent[ed] the conversation that took place" on October 4 between him and Petitioner, *id.* 206:9-15, and that there were no "additions, deletions or alterations of any kind," *id.* 206:16-18.

Detective Baughan testified that Petitioner told her he stole the cash register because he wanted to go back to jail.  *Id.* 129:7-8.  She denied "suggest[ing] to him perhaps that he should enter a program that might be of some use to him[.]"  *Id.* 140:1-6.

19

2.      The Defense Renews Its Request to Suppress
        <u>Evidence</u>

After Rothman testified at trial that officers from
the 60th Precinct reached Petitioner first, defense counsel moved
to reopen the suppression hearing on the ground that Rothman and
Rzonca had lied about arresting him themselves.   Trial Tr.
89:12-91:5.   Counsel argued that Rothman and Rzonca had told a
"totally different stor[y]" at the suppression hearing — namely,
that they stopped Petitioner before the 60th Precinct vehicle
arrived.   *Id.* 89:17-90:6.

The court denied the application to reopen the
suppression hearing.   Trial Tr. 90:7.   Defense counsel then
moved to "suppress everything because the wrong officers
testified at the hearing."   *Id.* 90:20-91:2.   That application
was also denied.   *Id.* 91:13.   Justice Chun stated that the
defense had an opportunity to cross-examine Rothman while he was
on the stand and "confront him with the alleged or apparent
inconsistencies," but Petitioner "was going *pro se* and he either
chose not to, or he deliberately did not, or he neglected to.
Either way, the opportunity has come and gone."   *Id.* 91:14-23.

After Rzonca's testimony on the third day of trial,
defense counsel again moved for the court to "grant the
suppression motion" because "the wrong officers testified at the

hearing." *Id.* 198:3-7.  That request was also denied.  *Id.* 198:8.

### 3.   Petitioner's Testimony

Petitioner took the stand; he was the defense's only witness.  He testified that at around 1:30 a.m. on October 4, 2007, he was walking from a 7-11 store to the picnic benches at Carvel, and when he was about a half-block away from the Carvel, he heard its siren go off.  Trial Tr. 236:12-237:22.  He was carrying a cup of coffee, a suitcase, and a backpack.  *Id.* 247:23-25.  Outside of the Carvel at that time were three teenagers and a "female" who was "walking the dogs."  *Id.* 237:23-238:10.  An unmarked police car then pulled up and two detectives in plain clothes arrested him.  *Id.* 238:20-24; 241:6-18.  After being detained in the unmarked car for about five to ten minutes, he saw a van pull up to the Carvel, which picked up two of the teens.  *Id.* 240:2-14.  He testified that these detectives then took him to the 61st Precinct station — not the 60th Precinct, as the State's witnesses claimed.  *Id.* 241:6-18.  At the 61st Precinct, he used information he overheard on the radio in the detectives' patrol car to craft his confession, because Detective Baughan promised in return to help him get into a drug treatment program.  *Id.* 242:14-244:4.

Towards the conclusion of his direct testimony, Petitioner repeated his claim that he had never seen Rothman or

Rzonca before the suppression hearing.  *Id.* 240:21-241:5; *see also id.* 273:23-274:1.  Petitioner did not mention anything about the alleged identification procedure during his direct testimony, despite having presented the theory in his opening argument.  *Id.* 19:5-7 (stating, in his opening argument, "these cops . . . [t]hey put me in a lineup — show-up lineup").

On cross-examination, Petitioner testified about the alleged "showup."  He stated that unnamed detectives brought him to the front of the Carvel, where they "[t]ried to get me [] identified as the person who went inside that place," *id.* 265:24-266:1; and brought the "two kids" and "the individual that brought them back to the store" (presumably the owner, based on prior testimony)[5] "down to try and identify me," *id.* 263:12-17.  Petitioner also stated that "when they went and got the individual to identify me — when the cop went and got the person to try to identify me as the person who stole the cash register, the female" — presumably the woman walking her dog —

---

[5]  At the suppression hearing, Petitioner had testified that he thought it was the Carvel owner that drove the two teens in the van.  H3 Tr. 7:14-8:11.  And at trial, he testified that "the individual that brought [the two kids] back to the store" drove a van, Trial Tr. 263:12-23, and that he believed the van driver was "affiliated with the Carvel," *id.* 239:13-16.

22

"told the officer I didn't have no cash register in my possession." *Id.* 284:12-16.

> ### 4.   Conviction and Sentencing

Trial concluded on March 9, 2010.  On that same day, before returning the verdict, Justice Chun gave himself a "missing witness charge as to the anti-crime officers [from the 60th Precinct] not being called," and he drew "the inference that if they were called, they may have testified somewhat unfavorabl[y] to the People."  Trial Tr. 322:18-25.  The judge then found Petitioner guilty of burglary in the third degree, criminal mischief in the fourth degree, petit larceny, and criminal possession of stolen property in the fifth degree.  *Id.* 324:1-7.

The case proceeded to sentencing on April 23, 2010. There, Justice Chun found that Petitioner qualified as a "persistent felony offender" under Section 70.01 of the New York Penal Code due to his criminal history, which included prior felony convictions for grand larceny, burglary, and attempted burglary.  Sentencing Tr. 5:21-7:16.  In light of this designation, the judge sentenced Mr. Jackson to a term of imprisonment of fifteen years to life.  *Id.* 10:19-23.

## E.   Direct Appeal and Post-Conviction Relief

Petitioner appealed the judgment of conviction to the Appellate Division.  On appeal, his counsel argued the trial

court violated Petitioner's right to self-representation at the
suppression hearing.  *See* ECF No. 7-7 at 16-21.  Petitioner also
submitted a *pro se* supplemental brief, claiming that the
prosecution had withheld *Brady* material including the names of
the 60th Precinct officers who he claims arrested him and
evidence of the alleged identification procedure.  *See* ECF No.
7-7 at 45-54.  He also argued that the State knew Officers
Rothman and Rzonca testified falsely at the hearing (in that
they claimed they were the ones who arrested Petitioner), and
the trial court erred in denying his request to reopen the
suppression hearing in light of this false testimony.  *Id*.  The
Appellate Division affirmed his conviction, *People v. Jackson*,
947 N.Y.S.2d 613 (N.Y. App. Div. 2012), and Petitioner was
denied leave to appeal to the New York Court of Appeals, *People
v. Jackson*, 20 N.Y.3d 1100 (2013).

On May 7, 2013, Petitioner filed a *pro se* petition in
this District for a writ of habeas corpus.  *Jackson v. Perez*,
No. 13-CV-3043 (E.D.N.Y.) (SLT), ECF No. 1.  By order dated
September 25, 2013, however, Judge Townes granted Petitioner
permission to withdraw that petition in order to exhaust his
ineffective assistance of counsel claim in state court.  *Id.*,
ECF No. 10.

Petitioner then moved to vacate his conviction
pursuant to New York Criminal Procedure Section 440.10 in the

Supreme Court, Kings County based on the ineffective assistance claim.  That motion was denied on June 27, 2014, *People v. Jackson*, Ind. No. 9802/07 (N.Y. Sup. Ct. June 27, 2014), ECF No. 7-8 at 69, and on December 5, 2014, he was denied leave to appeal to the Appellate Division, *People v. Jackson*, Ind. No. 9802/07 (N.Y. App. Div. Dec. 5, 2014), ECF No. 7-8 at 77.

On March 17, 2015, Petitioner filed the instant petition for a writ of habeas corpus.  Petition, ECF No. 1. Petitioner asserts four grounds for relief:  First, the state court deprived him of his constitutional right to self-representation at the suppression hearing.  Second, the prosecution violated its *Brady* obligations by failing to disclose, among other things, the names of the purported eyewitnesses to the burglary who denied that Petitioner committed it; Petitioner also claims, relatedly, that the prosecutors failed to correct false testimony and altered his videotaped confession.  Third, his counsel rendered ineffective assistance at the suppression hearing and at trial by failing to investigate and interview the exculpatory eyewitnesses and the unidentified officers from the 60th Precinct who allegedly questioned them.  Fourth, the state court failed to reopen the suppression hearing following the officers' testimony at trial, in violation of the Due Process Clause of the Fourteenth Amendment.

This Court held oral argument (but not an evidentiary hearing) on the petition on October 26, 2020.

### IV.  Standard of Review

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court.  Under the AEDPA, a petitioner challenging a determination that was "adjudicated on the merits" in state court must demonstrate that the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  A violation of constitutional rights must be demonstrated by a preponderance of the evidence, *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012), while a petitioner must rebut the presumption that the state court correctly determined a factual issue by clear and convincing evidence, 28 U.S.C. § 2254(e)(1).

A legal conclusion by a state court is "contrary to" clearly established federal law under Section 2254(d)(1) if it "applies a rule that contradicts the governing law set forth in the [Supreme Court's] cases or if it confronts a set of facts

26

that are materially indistinguishable from a decision" of the
Supreme Court, yet "arrives at a result different from [that]
precedent." *Price v. Vincent*, 538 U.S. 634, 640 (2003) (citing
*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (internal
quotations omitted)).  And a decision involves an "unreasonable
application" of federal law under the same sub-section "if the
state court identifies the correct governing legal principle
from [the Supreme Court's] decisions but unreasonably applies
that principle to the facts of the prisoner's case." *Williams*,
529 U.S. at 413.

A "federal habeas court may not issue the writ simply
because that court concludes in its independent judgment that
the relevant state-court decision applied clearly established
federal law erroneously or incorrectly.  Rather, it is the
habeas applicant's burden to show that the state court applied
[that case] to the facts of his case in an objectively
unreasonable manner." *Price*, 538 U.S. at 641 (cleaned up).

Because the petition was filed *pro se*, the Court
construes it liberally.  *Thompson v. Choinski*, 525 F.3d 205, 209
(2d Cir. 2008).

## V.   Discussion

## A. Ground One: Denial of Right to Self-Representation

Petitioner's first asserted ground for relief is that
the trial court violated his right to self-representation by

declining to allow him to proceed *pro se* for what amounted to one day of his pretrial suppression hearing.  This claim is without merit.  Petitioner cannot establish even a momentary violation, as he cites no "clearly established" Supreme Court precedent forbidding a trial court from so briefly postponing consideration of a criminal defendant's request to proceed *pro se*.  Moreover, as the state court noted, he waived the request before the court had a chance to decide it.

The Sixth Amendment guarantees a criminal defendant the right to self-representation.  *Faretta v. California*, 422 U.S. 806, 819–21 (1975).  A criminal defendant may invoke this right only by a "knowing, voluntary, and unequivocal waiver of the right to appointed counsel."  *Johnstone v. Kelly*, 808 F.2d 214, 216 (2d Cir. 1986) (discussing *Faretta*, 422 U.S. at 835-36).

At the end of the first day of the suppression hearing, Petitioner asked to proceed *pro se*.  He now alleges that Justice Konviser violated his rights when she denied this request "without conducting an appropriate inquiry."  Petition at 3.  On direct appeal, the Appellate Division found that Petitioner's "initial request to proceed *pro se* was not unequivocal because it was made in the context of expressing dissatisfaction with counsel's failure to highlight certain evidence at the suppression hearing, and did not reflect an

28

affirmative desire for self-representation." *People v. Jackson*, 947 N.Y.S.2d 613, 613-14 (N.Y. App. Div. 2012) (internal quotations and citations omitted).  The appellate court went on to hold that "[i]n any event, the defendant abandoned his request by subsequently acting in a manner indicating his satisfaction with counsel." *Id.* at 614.

Notwithstanding the state court's finding, Petitioner's initial assertion, "I am going *pro se*, your Honor," does appear unequivocal even though it was made in the context of expressing dissatisfaction with his lawyer. *See Wilson v. Walker*, 204 F.3d 33, 38 n.3 (2d Cir. 2000) ("Even assuming that [the petitioner's] principal reason for seeking to proceed *pro se* was dissatisfaction with [his counsel's] representation and that [the petitioner] might have been satisfied with a substitution of counsel, his requests were clear and unequivocal.").  "[A] defendant is not deemed to have equivocated in his desire for self-representation merely because he expresses that view in the alternative, simultaneously requests the appointment of new counsel, or uses it as a threat to obtain private counsel." *Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir. 1994).

Despite the Appellate Division's partial reliance on this observation, the denial of Petitioner's Sixth Amendment claim was not contrary to, or an unreasonable application of,

clearly established federal law.  Petitioner cites no Supreme
Court case holding that a judge must stop all proceedings and
decide *immediately* whether to grant a request to proceed *pro se*,
and this Court is aware of none.  *Faretta* does not require it.
Instead, *Faretta* requires the defendant's decision to be
knowing, voluntary, and unequivocal, 422 U.S. at 835-36; and
given this requirement, district courts routinely direct
defendants considering self-representation to spend some time
thinking about the risks inherent in that course.  Second
Circuit case law — which can guide the Court in determining what
constitutes "an unreasonable application" of "clearly
established law," *see Wilson v. McGinnis*, 413 F.3d 196, 199 (2d
Cir. 2005) — supports the notion that self-representation need
not begin instantaneously.  The Second Circuit has affirmed the
denial of a habeas petition where it was apparent the defendant
and judge both considered the *pro se* request "open for
discussion," even though the judge's initial reaction "could be
construed as a 'clear denial.'"  *Wilson*, 204 F.3d at 38; *see
also United States v. Barnes*, 693 F.3d 261, 272 (2d Cir. 2012)
(no violation where the judge made clear "at the first pretrial
conference following the court's receipt of [defendant's]

30

request to proceed *pro se*" that the court would "have to have a hearing" on the "application to represent himself").

Like in *Wilson*, Petitioner's request to proceed *pro se* remained "open for discussion" even though Justice Konviser declined to grant it on the spot. She did not categorically deny Petitioner's request on January 20, 2009. When Petitioner stated, "I am going *pro se*, your Honor," Justice Konviser answered, "You are not going *pro se* unless I say you are going *pro se*. Who's the Judge in this courtroom?" This conditional denial is best read, in context, as a response to Petitioner's unilateral declaration of a right that must be granted by the court to become effective. It was also made at what would have been the end of the suppression hearing, had Justice Konviser not decided, *sua sponte*, to call for Rzonca's testimony on the following day.

Petitioner then waived the request. "[G]iven the court's failure to enter a clear and conclusive denial, it was incumbent upon [Petitioner] to reassert his desire to proceed *pro se*" when proceedings resumed the next day. *Barnes*, 693 F.3d at 273 (quoting *Wilson*, 204 F.3d at 38) (cleaned up). Instead, he let Mr. Vogel represent him the next day, throughout Officer Rzonca's testimony, without raising the issue. *See Wilson*, 204 F.3d at 39 (finding petitioner waived his right to self-representation in part because of Petitioner's "apparent

31

cooperation" with counsel); *cf. McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984) ("Even when [a defendant] insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of or acquiescence in certain types of participation by [standby] counsel substantially undermines later protestations that counsel interfered unacceptably."). And at the end of Rzonca's testimony, Vogel reported that Petitioner was "not sure" about his representation request, and that he wanted some time to "think about" it. This equivocal conduct, taken together, amounts to waiver. *See Barnes*, 693 F.3d at 272 ("Where there has been no clear denial of the request to proceed *pro se* and the question of self-representation [i]s left open for possible further discussion, the defendant's failure to reassert his desire to proceed *pro se* and his apparent cooperation with his appointed counsel . . . constitute[s] a waiver of his previously asserted Sixth Amendment right to proceed *pro se*." (internal quotations omitted)).

Even so, Justice Konviser still initiated an inquiry into whether Petitioner's waiver of counsel was knowing, and again left the request open for further discussion when she told him after the second day of suppression-hearing testimony to "think about it." H1 Tr. 136:3-5. Then, on the next hearing date, February 17, 2009, for reasons unclear on the record, Petitioner outright abandoned the request — confirming with

Justice Konviser that he wanted new counsel, rather than to
represent himself.  Justice Konviser replaced Vogel with
Andreadis, who represented Petitioner at the reopened
suppression hearing on June 11, 2009.

It bears noting that Justice Konviser also considered
Petitioner's later *pro se* requests of July 29 and 30, 2009, and
indeed granted Petitioner the right to proceed *pro se* on October
2, 2009.  Petitioner began the trial *pro se*, but turned back to
counsel after the first day.

For these reasons, the Court finds that the state
court did not act contrary to, or unreasonably apply, clearly
established federal law in rejecting Petitioner's Sixth
Amendment claim.

**B.   Ground Two: Prosecutorial Misconduct**

Petitioner alleges next that the State engaged in
misconduct by failing to disclose exculpatory evidence under
*Brady v. Maryland,* 373 U.S. 82 (1967), and failing to correct
false testimony.  Both claims arise primarily from Petitioner's
theory that the testifying officers were not the ones who
arrested him, and that the officers who did would have testified
to the exculpatory lineup they allegedly conducted.
Petitioner's Br. at 4; *see also* Petition at 10.  He also claims
the State failed to identify the true 911 caller and to correct
the testimony of Sarine Gabay, because the 911 call records show

33

that the call came from a telephone registered to someone named "Mier Gabay," not Sarine Gabay.  Finally, he alleges that the State doctored his videotaped confession, because the tape played at trial did not show him requesting an attorney or describing the exculpatory identification procedure.

The Court considers the merits of these misconduct claims, despite the Respondent's contention that they are procedurally barred.[6]  I apply the deferential AEDPA standard, given that the state court rejected these claims on the merits.[7]  Applying that standard, the claims for relief on prosecutorial misconduct grounds must be denied, for the reasons that follow.

_____

[6] I reach the merits of Petitioner's prosecutorial misconduct claims despite the Appellate Division's conclusion that they were "largely unpreserved." *People v. Jackson*, 947 N.Y.S.2d 613 (N.Y. App. Div. 2012) (citations omitted).  Respondent urges that this determination constitutes an independent and adequate state-law bar to habeas review.  Respondent's Br. at 5-6.  However, to preclude habeas review, a state court's reliance on a procedural bar must be "unambiguous," and "when in doubt, courts should presume that the state court adjudicated the claim on the merits." *Garner v. Lee*, 908 F.3d 845, 859 (2d Cir. 2018).  Numerous courts in this circuit have held that the ambiguous phrase "*largely* unpreserved" does not preclude habeas review. *See, e.g., Castaldi v. Poole*, No. 07-CV-1420, 2013 WL 789986, at *3 (E.D.N.Y. Mar. 1, 2013).

[7] In addition to labelling Petitioner's prosecutorial misconduct claims "largely unpreserved," the Appellate Division found them to be "without merit." *People v. Jackson*, 947 N.Y.S.2d 613 (N.Y. App. Div. 2012).  Although the Appellate Division provided no reasoning in support of this finding, this phrase still qualifies as an "adjudication on the merits" for the purposes of 28 U.S.C. § 2254(d).  See *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) ("Nothing in the phrase 'adjudicated on the merits' [in 28 U.S.C. § 2254(d)] requires the state court to have explained its reasoning process.").

1. <u>Applicable Law</u>

    a.    *Brady v. Maryland*

The prosecution has a constitutional obligation to disclose exculpatory evidence that "is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. This obligation "covers not only exculpatory material, but also information that could be used to impeach a key government witness." *See United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Exculpatory evidence is considered "material" only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

    b.    *Use of False Testimony*

To challenge a conviction based on a prosecutor's use of false testimony, a defendant must establish that "(1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Helmsley*,

985 F.2d 1202, 1205–06 (2d Cir. 1993) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

2.   Failure to Turn Over Witness Statements
Regarding the Alleged Identification
Procedure

The Petitioner's claims regarding the exculpatory identification procedure do not provide a basis for habeas relief, because Petitioner has not adequately established a likelihood that the procedure actually occurred. *See, e.g.*, *Mannino v. Graham*, No. 06-CV-6371, 2009 WL 2058791, at *9 (E.D.N.Y. July 15, 2009) ("[T]o establish a *Brady* violation, a petitioner must initially establish that the evidence sought, in fact, existed.") (internal quotations omitted). The only evidence suggesting that an identification procedure occurred was Petitioner's testimony at trial. There are many reasons in the record, however, to doubt Petitioner's claim. Accordingly, his testimony does not constitute the "clear and convincing evidence" required to overcome the presumption that the state court's factual determination was correct. *See* 28 U.S.C. § 2254(e)(1).

First, one of the supposed *Brady* witnesses identified by the Petitioner — the owner of the Carvel store, Patrick Aceto — actually did testify, and he denied any recollection that police officers conducted, or he participated in, the purported identification procedure. *Compare* Trial Tr. 113:10-114:3 (Mr.

36

Aceto testifies that he was not asked to "look at any pictures of anybody" or to "look at a lineup"), *with* Petitioner's Reply Br. at 11 (contending that the Carvel owner was among the exculpatory witnesses at the "showup").  Mr. Aceto testified that he arrived at the Carvel store after the burglary had occurred, *id.* 102:20-103:12, and thus was never in a position to identify the culprit.  Indeed, Aceto stated that he had never seen Petitioner before the trial.  *Id.* 108:25-109:1; 116:5-6. This testimony from a largely disinterested witness directly contradicts Petitioner's *Brady* argument.

Second, neither of the arresting officers recalled any on-scene identification procedure, and two state judges found their testimony credible.

Third, the state court not only found that the officers' testimony was credible; it also ruled that Petitioner's rendition of the "show-up" was not.  Justice Konviser found explicitly that Petitioner's suppression hearing testimony — including about the circumstances of his arrest — was "incredible and unworthy of belief."  H4 Tr. 7:23-25.  And Justice Chun necessarily rejected Petitioner's testimony about the "show-up" in convicting him.  Had Justice Chun found it credible that multiple eyewitnesses — perhaps as many as seven — all said that they saw the perpetrator of the robbery, and all denied that Petitioner was him, it is difficult to envision how

37

he could then go on to conclude that the Petitioner was guilty beyond a reasonable doubt. *See Vera v. Woods*, No. 06-CV-1684, 2008 WL 2157112, at *9 (E.D.N.Y. May 21, 2008) (a federal habeas court must "resolve all issues of credibility in favor of" the verdict) (citing *United States v. Reyes*, 157 F.3d 949, 955 (2d Cir. 1998)). A state court's credibility findings "are entitled to great deference" on habeas review. *DeBerry v. Portuondo*, 403 F.3d 57, 68 (2d Cir. 2005). Here, Petitioner has not carried the heavy burden of producing clear and convincing evidence to overcome the presumption that the state court's factual determination was correct. *See* 28 U.S.C. § 2254(e)(1).

Without establishing the existence of the information alleged, there can be no *Brady* violation. *See, e.g.*, *Bullock v. Grassiano*, No. 13-CV-5081, 2013 WL 5774870, at *9 (E.D.N.Y. Oct. 24, 2013) (a court "cannot find an unreasonable application of *Brady* where there is nothing but conjecture as to whether such material even exists") (collecting cases); *Morris v. Kikendall*, No. 07-CV-2422, 2009 WL 1097922, at *6 (E.D.N.Y. Apr. 23, 2009) ("[N]othing in the state court record provides credible evidence that the [exculpatory evidence] ever existed and petitioner's uncorroborated testimony at trial, which was considered by the jury, does not provide a basis for habeas relief."); *Russell v. Rock*, No. 08-CV-1894, 2009 WL 1024714, at *4 (E.D.N.Y. Apr. 15, 2009) ("[T]here is no indication in the

record that the claimed exculpatory [] evidence even exists, and thus this evidence cannot form the basis for a *Brady* claim."). Therefore, the alleged identification procedure provides no basis for habeas relief.

### 3.   Failure to Identify the 60th Precinct Officers and Turn Over the "Log Sheet"

Petitioner also claims the State violated *Brady* by withholding the names of the 60th Precinct officers, who would have testified to the exculpatory lineup.  However, without sufficient evidence that the lineup actually occurred, Petitioner cannot establish that these officers' testimony would have been favorable.

For the same reasons, Petitioner's claim that the State violated *Brady* by not disclosing the 60th Precinct "log in and log out sheet" also fails.  Petition at 10.  At trial, Petitioner claimed in his opening argument that Officers Rothman and Rzonca "covered [up]" the alleged identification procedure "by saying that they took me to the 60 Precinct for half an hour" before transporting Petitioner to the 61st Precinct.  Trial Tr. 19:5-10.  Petitioner presumably believes that the log sheet would have supported his version of events.  However, this claim falters for the same reasons discussed above; without establishing that the exculpatory identification procedure occurred, it cannot be the basis of a *Brady* violation.

4.      Failure to Correct the Testimony of the 61st
        <u>Precinct Officers</u>

Petitioner alleges that Officers Rothman and Rzonca falsely testified at the suppression hearing and trial to the circumstances surrounding his arrest because they were not the arresting officers.  Petition at 7-8, 11; Petitioner's Br. at 10; *see also* Trial Tr. 273:19-274:1 (testifying that he had never seen Rothman or Rzonca before trial).  In light of their extensive testimony at the suppression hearing and at trial, however, as well as the respective judges' findings that they were credible, the Court finds that the Appellate Division's rejection of this claim was neither an unreasonable determination of the facts nor an unreasonable application of federal law.

Petitioner asserts other false-testimony claims against Rothman and Rzonca because of some relatively minor inconsistences between their testimony at the suppression hearing and trial.  In particular, Petitioner challenges the State's failure to correct Rothman and Rzonca when they testified at the suppression hearing that they initially stopped Petitioner (when, according to their testimony at trial, 60th Precinct officers had apprehended Petitioner moments earlier). This is a minor point, however; and the suppression-hearing testimony on this issue was more overlapping than contradictory.

At the suppression hearing, Rzonca testified that when they approached Petitioner, "simultaneously the 60 Anticrime Unit pulled up on the scene as well."  H1 Tr. 102:9-14; *see also* 106:3-4 ("The 60 Crime sergeant and Anticrime Unit were on the scene.").  Rothman testified that when they stopped Petitioner, "another patrol car had pulled up."  *Id*. 14:1-4.  And at trial, the officers testified that "there was a plainclothes unit from the 60 Precinct that came up behind [Petitioner], and we pretty much simultaneously pulled up on him," Trial Tr. 168:3-5 (Rzonca), but that the 60th Precinct officers might have arrived a "couple of seconds before us," *id*. 171:1-3 (Rzonca), and that by the time Rothman and Rzonca got out of the car, Petitioner was "already stopped," *id*. 36:22-25 (Rothman).

Minor differences in recollection regarding the relative times of arrival of the two sets of NYPD officers do not amount to perjury.  *See, e.g., United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) ("Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury."); *United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir. 1992) ("Differences in recollection alone do not add up to perjury."); *Torres v. Ercole*, 06-CV-0674, 2009 WL 4067281, at *15 (S.D.N.Y. Nov. 24, 2009) (denying habeas relief on false testimony claim because "any discrepancy between [the witness's] testimony at the first trial and at the *Huntley* hearing resulted

41

from his lack of recollection"), *aff'd* 421 F. App'x 6 (2d Cir. 2011).  On these facts, Petitioner has not established that the officers' testimony was materially false.

> 5.    Failure to Produce the 911 Call Record and
>        to Correct the Testimony of Sarine Gabay

Petitioner also claims the prosecution failed to produce the "prior statement" that Sarine Gabay (the 911 caller who testified at trial) made to the police.  Petition at 10.  The Court understands this allegation to refer to Sarine Gabay's 911 call record; however, the 911 call log was, in fact, produced to Petitioner before trial.  Respondent's Br. at 9; *see also* H1 Tr. 6:25-7:4.  Petitioner disputes this because the name shown on the call record is "Mier Gabay."  Petitioner's Br. at 7.  This argument, however, defies the common-sense conclusion that persons with the same last name often live together and share a phone line or bill.  For the same reason, the Court finds Petitioner's additional claim that Sarine Gabay falsely testified that she was the 911 caller, Petition at 3, 10, to be without merit.

> 6.    Alteration of the Videotaped Confession

Petitioner alleges that the prosecution introduced an altered version of his videotaped confession into evidence.  He claims that the complete tape would have shown (a) the detectives denying his request for an attorney and (b)

42

Petitioner explaining that he was arrested by two detectives in front of the Carvel and that eyewitnesses were unable to identify him as the perpetrator.  Petition at 10, 13; Petitioner's Br. at 29.  However, the record reveals that the video was played in its entirety at trial.  Trial Tr. 206:16-207:10.  And ADA Giannotti testified at trial that no "additions, deletions or alterations of any kind" had been made to the video.  *Id.* 206:16-18.  Petitioner claims ADA Giannotti's testimony was false, but there is no support in the record for that claim.  *See, e.g.*, *Brown v. Menifee*, No. 99-CV-1258, 2004 WL 1810341, at *6 (E.D.N.Y. Aug. 9, 2004)  (denying petitioner's prosecutorial misconduct claim where there was no evidence that the State witness's testimony was false or that the alleged police-communication tape existed); *Morris*, 2009 WL 1097922, at *15 ("[T]here is absolutely no basis in the record to conclude that the government destroyed or suppressed any evidence (such as a video or logbook), nor any basis to conclude that the government tampered with evidence. . . .").  In addition, this claim is inconsistent with Petitioner's admission at the suppression hearing that he did not ask for a lawyer during the videotaped confession.  H3 Tr. 49:15-50:4.

*          *          *          *          *

For these reasons, the Appellate Division's decision that the prosecutorial misconduct claims were without merit was

43

not predicated on an unreasonable determination of the facts nor an unreasonable application of federal law.

**C.    Ground Three: Ineffective Assistance of Counsel**

Petitioner alleges that the attorneys representing him at the suppression hearing and trial violated his Sixth Amendment right to effective assistance of counsel because they failed to pursue his theories related to the alleged exculpatory witnesses, the 911 call, and Petitioner's written and videotaped confessions.  The appropriate inquiry on habeas review is whether the state court's ineffective-assistance determination was contrary to, or an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Pursuant to *Strickland*, an individual claiming ineffective assistance (1) "must show that counsel's performance was deficient," such that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) "that the deficient performance prejudiced the defense" in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 687).  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of

44

reasonable professional judgment." *Strickland*, 466 U.S. at 690.

Combined with the deference built into the AEDPA, habeas review

of ineffective assistance claims becomes "doubly deferential."

*Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

Petitioner does not establish that the state court's

decision to deny his ineffective assistance claims on Section

440 review was an unreasonable application of *Strickland* or

based on an unreasonable determination of the facts.[8]

First, as the state Supreme Court noted, certain of

Petitioner's claims are contradicted by the record.  Petitioner

claims his counsel failed to move to suppress his confessions as

involuntary and in violation of *Miranda*, Petitioner's Br. at 4,

28; but the record of the suppression hearing clearly indicates

defense counsel did move to suppress on this basis pursuant to

*People v. Huntley*, 15 N.Y.2d 72 (1965).  *See, e.g.*, H1 Tr. 3:24-

4:2.

With respect to the 911 call, Petitioner asserts that

counsel failed to:  investigate the 911 recording contents or

interview Sarine Gabay, Petitioner's Br. at 3; challenge the

testimony of Sarine Gabay, *id*. at 17; interview Mier Gabay, *id*.

---

[8] Also, pursuant to Second Circuit precedent, the state Supreme Court's
application of New York's "meaningful representation" standard in evaluating
Petitioner's ineffective assistance of counsel claims was not contrary to the
*Strickland* standard.  *See, e.g.*, *Eze v. Senkowski*, 321 F.3d 110, 123-24 (2d
Cir. 2003).

at 7; and assert at trial that Mier Gabay made the 911 call, *id*. at 17.  The Supreme Court found these claims to be "unsupported speculation proffered solely by the defendant," and concluded that "it is evident from the record as a whole that the defendant's speculation is inaccurate." *People v. Jackson*, Ind. No. 9802/07 (N.Y. Sup. Ct. June 27, 2014), at 4.  As set forth above, there is no basis to conclude that someone other than Sarine Gabay made the 911 call.  In addition, the record shows that the 911 call was produced to Petitioner's counsel before trial.  H1 Tr. 6:25-7:4.

With respect to the videotaped confession, Petitioner asserts that counsel failed to:  introduce into evidence a complete copy of the videotaped statement, Petitioner's Br. at 14, 31; investigate and cross-examine ADA Giannotti regarding whether the videotape was altered, Petitioner's Br. at 3, 22; or object to ADA Giannotti's testimony that the videotape played at trial was complete and accurate, Petition at 7.  The Supreme Court found these claims to be "contradicted by the record" and "unreasonable," and concluded that defense counsel's inaction therefore "could be attributed to tactical trial decisions." *People v. Jackson*, Ind. No. 9802/07 (N.Y. Sup. Ct. June 27, 2014), at 4-5.  Once again, this Court finds no reason to believe the videotape was altered, and the record shows that the entire videotape was indeed admitted.  Trial Tr. 206:16-207:10.

Therefore, counsel's decision not to pursue this line of questioning was well within the bounds of professional judgment. *See Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) ("The failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which Petitioner was entitled." (internal quotations omitted)).

Finally, Petitioner claims that his counsel was ineffective for failing to investigate and interview the unidentified officers from the 60th Precinct and the eyewitnesses who allegedly participated in the exculpatory identification procedure. Petitioner's Br. at 3. The Appellate Division found these claims to be without merit, relying in part on an affidavit from trial counsel Martin Goldberg, dated October 17, 2013, in which he averred that he did not believe that any "show-up identification" occurred. ECF No. 17. Mr. Goldberg's doubts are eminently reasonable for the reasons stated in Section V.B.2, above, that call Petitioner's allegations about the identification procedure into doubt.

Given that Petitioner has not shown by clear and convincing evidence that the identification procedure occurred, he cannot establish that counsel exercised unreasonable professional judgment by failing to expend additional efforts locating the alleged participants. "Under *Strickland* . . . 'strategic choices made after less than complete investigation

are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (quoting *Strickland*, 466 U.S. at 690-91).

The state court's decision to deny Petitioner's ineffective assistance claims was not an unreasonable application of *Strickland* or based on an unreasonable determination of the facts.

**D.    Ground Four: Failure to Reopen the Suppression Hearing**

Petitioner alleges that the state court deprived him of due process and a fair trial when it denied his motion — made mid-trial — to reopen the suppression hearing.  Petition at 15. Defense counsel moved to reopen the hearing following Rothman's trial testimony that officers from the 60th Precinct stopped and arrested Petitioner, which Petitioner claimed contradicted Rothman's and Rzonca's testimony at the suppression hearing that they were the arresting officers.

This claim, however, is not cognizable on habeas review.  Petitioner is not alleging a constitutional violation, but is instead challenging a decision that the trial court made on state-law grounds.  *See, e.g., McCrary v. Lee*, No. 12-CV-

2867, 2016 WL 1029493, at *3 (E.D.N.Y. Mar. 15, 2016) ("[T]he state court's denial of Petitioner's request to reopen the suppression hearing constituted a state-law evidentiary ruling not within the scope of federal habeas review."); *Woodard v. Chappius*, No. 13-CV-6123, 2014 WL 122359, at *7 (W.D.N.Y. Jan. 13, 2014) ("[Petitioner's] claim regarding the denial of his motion to reopen the suppression hearing presents solely a matter of state law."), *aff'd* 631 F. App'x 65 (2d Cir. 2016). It is axiomatic that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

In any event, the Appellate Division found the trial court had not abused its discretion in refusing to reopen the suppression hearing, pursuant to Section 710.40(4) of the New York Criminal Procedure Law, because Petitioner "failed to show that these officers would have testified to new facts, not discoverable with reasonable diligence before the determination of the motion, that would have affected the court's ultimate determination of the issue of probable cause." *People v. Jackson*, 97 A.D.3d 693, 694 (2012). Section 710.40(4) is founded on a presumption that a criminal defendant "know[s] the circumstances of his or her own arrest and therefore is capable of eliciting evidence of those circumstances at a pretrial

49

hearing." *People v. Velez*, 829 N.Y.S.2d 209, 212 (N.Y. App. Div. Feb. 6, 2007).

In addition to requesting to reopen the suppression hearing, defense counsel also moved twice during trial to suppress evidence, arguing in support that the arresting officers from the 60th Precinct did not testify at the suppression hearing.  To the extent Petitioner's habeas claim is premised on the argument that these motions should have been granted, and the evidence excluded at trial, it is precluded by *Stone v. Powell*, 428 U.S. 465 (1976).  In *Stone*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 494; *see also Capellan v. Riley*, 975 F.2d 67, 70 n.1 (2d Cir. 1992) ("[F]ederal courts have approved New York's procedure for litigating Fourth Amendment claims . . . .").  Following *Stone*, the Second Circuit limited habeas review of Fourth Amendment claims to two scenarios: (1) where "the state [] provided no corrective procedures at all to redress the alleged fourth amendment violations" or (2) where "the state [] provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the

50

underlying process." *Capellan*, 975 F.2d at 70.  The focus of
the inquiry into whether there was an "unconscionable breakdown"
in the state corrective process is on "the existence and
application of the *corrective procedures* themselves" rather than
on the "*outcome* resulting from the application of adequate state
court corrective procedures."   *Id.* at 71.

Petitioner makes no showing that there was "an
unconscionable breakdown in the underlying process" here.  A
two-day *Dunaway / Mapp / Huntley* hearing was held, at which two
officers and one detective from the 61st Precinct testified.  The
officers, who were subject to cross-examination, testified that
officers from the 60th Precinct were at the scene
"simultaneously," that Petitioner was placed in the back of the
60th Precinct car, and that he was first taken back to the 60th
Precinct.  Petitioner had ample opportunity at this hearing to
inquire into the identity and role of the 60th Precinct officers.
Indeed, defense counsel asked on cross examination if Rothman
knew the names of those officers.  The court then issued a
reasoned ruling addressing each of Petitioner's claims, and in
fact granted his motion to suppress the keys. *See, e.g.*, *Hicks
v. Bellnier*, 43 F. Supp. 3d 214, 231 (E.D.N.Y. 2014)
("Petitioner would be hard-pressed" to establish such "an
unconscionable breakdown" where "the trial court held an
evidentiary hearing, allowed Petitioner to present a case in

support of his motion, and issued a reasoned ruling that there
was reasonable suspicion to stop Petitioner and that the
resulting evidence would be admissible at trial").

When Petitioner moved to reopen the suppression
hearing so that he could testify, that request was granted, and
the court heard an additional day of testimony on the
suppression issue.  Thereafter, the court again issued a
reasoned opinion summarizing and addressing Petitioner's version
of events, ultimately finding them "unworthy of belief."  In
addition, post-trial, Petitioner took advantage of state appeal
procedures.  *See, e.g.*, *Singh v. Miller*, 104 F. App'x 770, 772
(2d Cir. 2004) (finding no unconscionable breakdown occurred
where petitioner raised his Fourth Amendment claims at a
suppression hearing and on appeal).

Petitioner is therefore not entitled to habeas relief
on this ground.

### VI.  Evidentiary Hearing

Petitioner requests an evidentiary hearing on all
grounds.  Petition at 20.  In particular, he seeks to "develop
the evidence necessary to establish that petitioner was denied
due process and that he was denied the right to counsel."
Petitioner's Br. at 19.  However, 28 U.S.C. § 2254(e)(2)(A)
precludes an evidentiary hearing because Petitioner has not
shown that his claims rely upon "a new rule of constitutional

52

law, made retroactive to cases on collateral review by the
Supreme Court, that was previously unavailable; or a factual
predicate that could not have been previously discovered through
the exercise of due diligence." *Id.* Moreover, a district court
is not required to hold an evidentiary hearing "if the record
refutes the applicant's factual allegations." *Schriro v.
Landrigan*, 550 U.S. 465, 474 (2007). Therefore, the Court
denies Petitioner's request for an evidentiary hearing in its
entirety.

## VII. Conclusion

        For the reasons stated, the petition for a writ of
habeas corpus is denied. Because Petitioner has not made a
substantial showing of the denial of a constitutional right, no
certificate of appealability will issue. *See* 28 U.S.C.
§ 2253(c). The Court certifies pursuant to 28 U.S.C.
§ 1915(a)(3) that any appeal would not be taken in good faith
and *in forma pauperis* status is therefore denied for purposes of

an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is directed to mail a copy of this Order to the *pro se* Petitioner.

SO ORDERED.


                                    /s Eric Komitee
                                    ERIC KOMITEE
                                    United States District Judge


Dated:     December 4, 2020
           Brooklyn, New York